**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

AMANDA N. LATTA,

PLAINTIFF,

v.

U.S. DEPARTMENT OF EDUCATION,

and

MIGUEL CARDONA, SECRETARY OF
EDUCATION, in his official capacity,

DEFENDANTS.

CIVIL ACTION NO. 2:22-cv-04255

Judge Michael H. Watson

**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**

Plaintiff moves for a Temporary Restraining Order and a Preliminary Injunction precluding

the implementation of the Loan Forgiveness Program (as described in the Complaint) for the

reasons set forth below in the Memorandum in Support.

Respectfully submitted

*/s/ David C. Tryon*
David C. Tryon (#0028954)
Jay Carson (#0068526)
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
d.tryon@buckeyeinstitute.org
*Counsel for Plaintiff*

**MEMORANDUM IN SUPPORT**

**INTRODUCTION**

Amanda Latta, like all student loan borrowers, executed a promissory note ("MPN") in which she agreed to repay those loans in full.[1] Many college graduates have already fulfilled those commitments and repaid their debts. Historically, the Department of Education (the "Department") has defaulted those who have not timely paid and then hired debt collectors to enforce those promissory notes and collect past-due loans, with penalties, additional interest and collection fees.

In 2020, in response to questions regarding loan repayments, the Department determined that a broad debt forgiveness program without congressional approval would be illegal. But then, shortly before the 2022 midterm elections, the Biden administration promised that it would forgive up to $20,000 of student debt, ostensibly because of the financial harm caused by the COVID pandemic--even though those same students had been excused from making any payments for the last two years. Congress never agreed to such a forgiveness. On August 24, 2022, the Department announced the Loan Forgiveness Program (or "LFP") to implement the Biden administration's promise.

Ms. Latta is eligible, and has applied for, $10,000 of debt forgiveness.[2]  She could do a lot with $10,000, but she recognizes the problematic legal nature of the Loan Forgiveness Program and that it is unfair to those who previously worked hard to pay off their student loans. She also knows that if she accepts the debt forgiveness and it is later determined to be illegal, the Department of Education is obligated, pursuant to her promissory note and the law, to collect those funds—not only the original principal amount, but late fees, an increased interest rate, and

CONFIDENTIAL Atty-Client/WP

---

[1] Compl. at ¶ 17.
[2] Compl. at ¶ 71.

1

collection fees.[3]

The Loan Forgiveness Program violates the Constitution, misconstrues and misapplies the HEROES Act, and flouts the Administrative Procedure Act. In addition, unless enjoined, the Department's scheme will inflict irreparable harm not only on Plaintiff but also on many other similarly situated persons who will suffer the financial consequences of unwise decisions based on a mistaken expectation of future debt relief.

A temporary restraining order ("TRO") and preliminary injunction from this court is timely and necessary notwithstanding other challenges to the Loan Forgiveness Program. At the time of filing this motion, two challenges to the Loan Forgiveness Program are pending before the U.S. Supreme Court.[4]  Like the other challenges to the Loan Forgiveness Program, the Department of Education has continually focused its objections on the issue of standing.[5]  In no uncertain terms, the Department and the Biden administration have stated that as soon as any stay is lifted by the courts, the Department will immediately forgive the debt of at least 16 million borrowers.[6]  If the Department prevails in the Supreme Court on standing grounds alone, Plaintiff Latta and other applicants are at risk of immediate irreparable harm unless this Court has already issued a concurrent injunction. Because Ms. Latta has a different basis for standing than the plaintiffs in other pending cases, it is essential that she receive immediate relief to prevent the harms that could accrue if the current stay is lifted based upon a finding that the other plaintiffs lack standing.

Therefore, Plaintiff moves for a TRO and preliminary injunction to halt the Defendant's imminent unconstitutional action to forgive the loans of approximately 40,000,000 students and

---

[3] Compl. at ¶ 91.
[4] *Biden* v. *Nebraska*, No. 22-506, 2022 WL 17348754 (Dec. 1, 2022); *Dep't of Educ.* v. *Brown*, No. 22-535, 2022 WL 17574107 (Dec. 12, 2022).
[5] *See e.g.*, *Brown*, No. 22-535, 2022 WL 17574107 (Dec. 12, 2022).
[6] *Statement from Secretary of Education Miguel Cardona on District Court Ruling on Biden-Harris Administration Student Debt Relief Program*, U.S. Dep't of Educ. (Nov. 11, 2022), https://tinyurl.com/mrbnftu6.

an estimated one-half-trillion dollars in student loans.

## I. THE LOAN FORGIVENESS PROGRAM.

Over many years, Congress has enacted both student loan programs and student loan forgiveness programs. The latter include the Public Service Loan Forgiveness Program,[7] the Teacher Loan Forgiveness Program,[8] the Closed School Discharge Program,[9] and the Total and Permanent Disability Discharge Program[10]. Congress has not, however, enacted a comprehensive debt forgiveness program for all, or even a substantial portion of, federal student loan borrowers.

Moreover, Congress has not appropriated any funds to replace the debts owed to the treasury or for the administrations announced direct payments to those who have already paid their loans.[11] Similarly, Congress has not authorized the disposal of the student loan accounts receivable, which constitute "[p]roperty belonging to the United States."[12] Nevertheless, the Department has announced that it will do both without obtaining congressional approval.[13]

Any broad debt forgiveness program related to federal student loans must come from a congressionally prescribed amendment to the Higher Education Act, as it is Congress' duty to write the laws. In January 2021, the Office of General Counsel of Defendant Department of Education issued a legal memorandum (the "Rubinstein Memo") responding to then-Secretary DeVos's question whether the HEROES Act allowed her to "cancel, compromise, discharge or forgive, on a blanket or mass basis, principal balances of [federal] student loans."[14] The Rubinstein

---

[7] 20 U.S.C. § 1087e(m).

[8] 20 U.S.C. § 1078-10.

[9] 20 U.S.C. § 1087(c).

[10] 20 U.S.C. § 1087(a)(1).

[11] *See* 20 U.S.C. § 1087a(a) (appropriating sums necessary "to make loans").

[12] *See* U.S. Const. art. IV, § 3, cl. 2.

[13] U.S. Dep't of Educ., *One-time Federal Student Loan Debt Relief*, Federal Student Aid, https://perma.cc/L2E6-DGF6 (last visited Nov. 17, 2022).

[14] *See* Reed Rubinstein, U.S. Dep't of Educ., Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority (Jan. 12, 2021), http://bit.ly/3LBA36n.

Memo concluded that "the Secretary does not have statutory authority to provide blanket or mass cancellation, compromise, discharge, or forgiveness of student loan principal balances, and/or to materially modify the repayment amounts or terms thereof, whether due to the COVID-19 pandemic or for any other reason."[15] It further explained that "[a]lthough Congress could enact legislation authorizing the Department to provide blanket or mass cancellation . . . of student loan principal balances, and/or to materially modify repayment amounts or terms, it has not done so."[16]

House Speaker Nancy Pelosi (D-CA) agreed that President Biden does not have authority to cancel student loan debt and that student loan forgiveness can only be accomplished through "an act of Congress."[17] When Congress declined to so act, the Biden administration ignored the law and unilaterally tried to forgive the debt.

On August 24, 2022, President Biden announced through a press conference that the Department of Education would implement the Loan Forgiveness Plan providing for $10,000 to $20,000 forgiveness for eligible borrowers.[18] On the same date, acting under the supposed authority vested in it due to a two-and-a-half-year-old pandemic, the Department of Education also announced that it would forgive up to $20,000 per student in student loan debt, without the required amendment of various United States statutes and regulations.[19]

On October 12, 2022, Defendants published an official notice of the program in the Federal Register.[20] According to the Federal Register notice, the Loan Forgiveness Program is authorized

---

[15] *Id.* at 8.

[16] *Id.* at 3.

[17] Adam S. Minsky, *Pelosi: President Biden Does Not Have Power to Cancel Student Loan Debt – What it Means for Borrowers*, FORBES (Jul. 28, 2021), https://tinyurl.com/PelosiForbes.

[18] U.S. Executive Office of the President, Remarks by President Biden Announcing Student Loan Debt Relief Plan, The White House, https://tinyurl.com/fwvjx5tr (last visited Nov. 17, 2022).

[19] *Biden-Harris Administration Announces Final Student Loan Pause Extension Through December 31 and Targeted Debt Cancellation to Smooth Transition to Repayment*, U.S. Dep't of Educ. (Aug. 24, 2022), https://tinyurl.com/3zyb83h2.

[20] *See* Federal Student Aid Programs, 87 Fed. Reg. 61512 (Oct. 12, 2022).

4

by the Higher Education Relief Opportunities for Students Act of 2003[21] ("HEROES Act") and became effective immediately without prior public notice and opportunity to comment.[22] Defendants assert "there are 8 million people for whom we have data and who will get the relief without applying unless they choose to opt out."[23]  Debt forgiveness for these 8 million borrowers is imminent.[24]  On October 14, Defendants launched an online application portal through which other borrowers may apply for loan cancellation.[25]  As of November 3, 2022, nearly 26 million borrowers had already applied for debt cancellation.[26]  Defendants continued to ask borrowers to "[a]pply now and encourage others to take advantage of this relief,"[27] until stopped by court action.[28] But, despite those court orders, the Department continued to process all received applications with the stated intention to effectuate the loan cancellations for those applicants immediately upon any pause, vacation or change in the aforementioned court orders.[29]

As described in the October 12 Federal Register notice, the program will "discharge the balance" of certain unpaid student loans owed to the federal government up to a maximum of $20,000 for borrowers who also received Pell Grants to fund their education and had an adjusted gross income in either 2020 or 2021 that was below $125,000 for an individual taxpayer or below

---

[21] 20 U.S.C. § 1098bb.

[22] Federal Student Aid Programs, 87 Fed. Reg. at 61512.

[23] U.S. Dep't of Educ., *The Biden-Harris Administration's Student Debt Relief Plan Explained*, Federal Student Aid, https://studentaid.gov/debt-relief-announcement (last visited Dec. 17, 2022).

[24] Party Stipulation at 1, *Nebraska* v. *Biden*, 2022 WL 11728905 (E.D. Mo. 2022) (No. 22-cv-1040) (stipulating that "Defendants will not discharge any student loan debt . . . before October 17, 2022").

[25] Kelli Grant, *Education Department begins beta testing for student loan forgiveness application*, CNBC (Oct. 14, 2022), http://tinyurl.com/4vxutvck.

[26] Joseph Biden (@POTUS), Twitter (Nov. 3, 2022, 7:59 PM), http://tinyurl.com/shnhcc6v.

[27] The White House (@WhiteHouse), Twitter (Oct. 17, 2022, 3:48 PM), http://tinyurl.com/4jnk4dxn.

[28] U.S. Dep't of Educ., *Student Loan Debt Relief is Blocked*, Federal Student Aid, http://studentaid.gov/debt-relief/application (last visited Nov. 30, 2022).

[29] Isabella Zavarise and Ayelet Sheffey, *One day after asking the Supreme Court to save its student-loan forgiveness plan, the Biden Administration started notifying applicants they'd been approved*, Insider (Nov. 19, 2022), http://tinyurl.com/yc65k2zh.

$250,000 for borrowers filing jointly.[30] Borrowers below the same income thresholds who did not receive Pell Grants will be eligible for a debt discharge of $10,000.[31] The notice further explained that no debt discharge would be available to anyone who took out their loan after June 30, 2022.[32]

The notice failed to explain the rationale for the most basic features of the Loan Forgiveness Program. It did not explain how the Defendants determined: (i) the arbitrary maximum amounts of the discharge; (ii) the arbitrary income level thresholds set for eligibility; (iii) why the maximum eligible discharge amount for every Pell Grant recipient would be exactly double that for every borrower who did not receive a Pell Grant; (iv) why a borrower who took out a loan on or before June 30, 2022 would be eligible for the maximum discharge amount while borrowers who took out their loans after that date would get nothing; or (v) why taxpayers who depleted personal savings to pay for their own education, or took out educational loans and paid them back as promised, or never went to college, get nothing and yet will be saddled with paying one-half-trillion dollars of unpaid debts owed by relatively affluent and well-educated fellow citizens.

The Loan Forgiveness Program affects more than 40 million borrowers. The Congressional Budget Office estimates the one-time cost of the Loan Forgiveness Program to be $430 billion,[33] whereas the Wharton School of the University of Pennsylvania concluded that it will cost up to $519 billion over ten years.[34]

Not only does this debt forgiveness program violate the Constitution, it is also arbitrary,

---

[30] Federal Student Aid Programs, 87 Fed. Reg. at 61514.

[31] *Id.*

[32] *Id.*

[33] Phillip L. Swagel, Cong. Budget Office, Costs of Suspending Student Loan Payments and Canceling Debt 3 (Sep. 26, 2022), https://tinyurl.com/3md68dza.

[34] *See* Junlei Chen & Kent Smetters, *The Biden Student Loan Forgiveness Plan: Budgetary Costs and Distributional Impact*, Penn Wharton Budget Model (Aug. 26, 2022), https://tinyurl.com/PennBudgetModel.

capricious, an abuse of discretion, and does not follow the proper procedures for using the national emergency powers. The program's potential illegality leaves student loan borrowers subject to default, future civil penalties, increased interest rates via interest upon interest, debt acceleration, adverse credit ratings, and the uncertainty of their legal rights.[35]

## II.  PLAINTIFF'S STANDING

**A.  Legal Standard.**  To establish Article III standing, a plaintiff must plead: (1) an injury-in-fact; (2) that is fairly traceable to the challenged action of defendants; and (3) will be redressed by a favorable decision.[36]  An injury-in-fact sufficient to confer standing is an injury "that is concrete, particularized, and actual or imminent."[37] Financial harms, no matter how minor, constitute injuries-in-fact.[38]

**B.  Plaintiff's standing under the APA.**  In the APA context, a plaintiff can "show a cognizable injury if [she] has been deprived of 'a procedural right to protect [her] concrete interests.'"[39]  "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right."[40] The redressability requirement, in turn, "is lighter when the plaintiff asserts deprivation of a procedural right."[41]  "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."[42]  Moreover,

---

[35] *See* U.S. Dep't of Educ., *Student Loan Delinquency and Default*, Federal Student Aid, http://tinyurl.com/yc6bn3vn (last visited Nov. 17, 2022).

[36] *Friends of the Earth, Inc.* v. *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

[37] *TransUnion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2203 (2021).

[38] *See, e.g.*, *Czyzewski* v. *Jevic Holding Corp.*, 580 U.S. 451, 462 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

[39] *Texas* v. *EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) (quoting *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 496 (2009)).

[40] *Id.*

[41] *Id.*

[42] *Id.* (quoting *Texas* v. *United States*, 809 F.3d 134, 150-151 (5th Cir. 2015)).

where, as here, the plaintiffs are "an object of the action," there is "ordinarily little question that the action or inaction has caused [them] injury, and that a judgment preventing or requiring the action will redress it."[43] In these situations, a plaintiff's "standing to seek review of [the] administrative action is self-evident."[44]

Under the APA, Plaintiff should have had "an opportunity to participate in and influence [the Department's] decision making at an early stage, when the agency [was] more likely to give real consideration to alternative ideas."[45] But the Department deprived the Plaintiff of her "procedural right to protect [her] concrete interests."[46] Plaintiff wants the "opportunity to pursue [the] benefit" of debt forgiveness.[47] If the Department is going to pursue debt forgiveness, Plaintiff believes that she should be eligible for forgiveness of the entire $20,000 of her student loan debt.[48]

In addition, Plaintiff's injury flows from the Program's eligibility requirements.[49] And Plaintiff satisfies the "lighter" redressability requirements because if the Program is vacated and set aside, the Department must go through the proper rulemaking procedures.[50]

**C. Plaintiff's standing under the Declaratory Judgment Act (28 U.S.C. § 2201).** There is an actual contractual controversy between Plaintiff and the Department. Determining if there is such a controversy, rather than an abstract question "is necessarily one of degree . . . ."[51] Here

---

[43] *Id.* at 446 (quoting *Lujan*, 504 U.S. at 560-61).

[44] *Fund for Animals, Inc.* v. *Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (citation omitted).

[45] *U.S. Steel Corp.* v. *EPA*, 595 F.2d 207, 213 (5th Cir. 1979).

[46] *EEOC*, 933 F.3d at 447 (quoting *Summers*, 555 U.S. at 496).

[47] *Ecosystem Invest. Partners* v. *Crosby Dredging, LLC,* 729 F.Appx 287, 292-93 (5th Cir. 2018).

[48] Compl. at ¶ 24.

[49] *See id.* at 293.

[50] *EEOC*, 933 F.3d at 447; *see e.g.*, *Texas* v. *United States*, 787 F.3d 733, 753-54 (5th Cir. 2015) (finding standing because enjoining the implementation of a program until it undergoes notice and comment could prompt the agency to reconsider its decision).

[51] *Maryland Cas. Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

there is "a substantial controversy."[52]  The Department says that Plaintiff will be forgiven of $10,000 of student loan debt. But the forgiveness will be ineffective and the Department will be obligated to collect the debt from Plaintiff if it the program is declared to be illegal.  At least one court has said that the program is illegal, so if that decision is upheld, she will be required to repay her debt. This is a substantial controversy "between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[53] Plaintiff seeks a declaration of her rights and obligations under the MPN because she needs to know now what her current and future obligations are given that if the Loan Forgiveness Program is illegal, the Secretary has a non-waivable *obligation* to collect debts owed to the department.[54] Accordingly, she is entitled to know her obligations under the MPN in light of the Loan Forgiveness Program.

Pursuant to Plaintiff's MPN, Plaintiff Latta "promise[d] to pay to ED all loan amounts disbursed under the terms of th[e] MPN, plus interest and other charges and fees that may become due . . . ."[55]  The MPN directs "[y]ou must repay the full amount of the loans made under this MPN, plus accrued interest."[56]  If she fails to pay the entire amount disbursed plus interests and other charges and fees, she will be liable for "reasonable collection costs, including but not limited to attorney fees, court costs, and other fees."[57]  The MPN further states:

> LATE CHARGES AND COLLECTION COSTS: We may collect from you:  A late charge of not more than six cents for each dollar of each late payment if you do not make any part of a required installment payment within 30 days after it becomes due, and any other charges and fees that are permitted by the Act related to the collection of your loans. If you default on a loan, you must pay reasonable

---

[52] *Brown* v. *U.S. Dep't of Educ.,* No 4:22-cv-0908-P, 2022 WL 16858525 (N.D. Tex Nov. 10, 2022), *stay pending appeal denied*, No. 22-11115 (5th Cir.), *cert. granted* No. 22-535 (Dec. 12, 2022).
[53] *Maryland Cas. Co.*, 312 U.S. at 273.
[54] *See* 31 U.S.C. § 3711(a).
[55] Compl. at ¶ 58; Compl. Ex. A at 2.
[56] Compl. Ex. A at 4.
[57] Compl. Ex. A at 2.

collection costs, plus court costs and attorney fees.[58]

Additionally, if she defaults on her loan, the Department can require her to pay the entire unpaid balance of the loan at once, plus a six percent late fee, and a capitalization of interest (which will bear interest, also known as interest on interest).[59]

Before the pandemic payment pause, the Department, in fact, enforced loan repayments. From January 2018 through September 2018, it retrieved over $5.4 billion in defaulted loans.[60] $662 million of those retrieved funds were from wage garnishments.[61] Historically, the Department contracted with private entities to collect on its loans, and these entities earn income based upon the amount of debt repayments they successfully process.[62] Consequently, the private entities and the Department will be incentivized to seek repayment from the borrowers if the program is found to be illegal.

The MPN further states: "If we do not enforce or insist on compliance with any term of this MPN, it does not waive any of our rights. No provision of this MPN may be modified or waived, unless we do so in writing."[63] The only other provision allowing modifications to the MPN provides that "[a]ny [legal] amendment to the [Higher Education Act of 1965 (the "HEA")] that affects the terms of this MPN will be applied to your loans . . . ."[64] But, the Loan Forgiveness Program does not legally amend the HEA.

The MPN also states: "If you default, the default will be reported to nationwide consumer

---

[58] Compl. Ex. A at 4.

[59] Compl. Ex. A at 4.

[60] *See* U.S. Dep't of Educ., *Default Rates*, Federal Student Aid, http://tinyurl.com/2w3pyf3d (last visited Nov. 17, 2022).

[61] *Id.*

[62] Mark Kantrowitz, *How Much Do Federal Student Loan Servicers Make Per Loan*, The College Investor (updated Aug. 24, 2022), http://tinyurl.com/3wvu3eut; *see* U.S. Dep't of Educ., *Private Collection Agencies – Archives*, Federal Student Aid, http://tinyurl.com/4b82fmda (last visited Nov. 30, 2022).

[63] Compl. Ex. A at 4.

[64] Compl. Ex. A at 6.

reporting agencies (credit bureaus) and will significantly and adversely affect your credit history. A default will have additional adverse consequences as explained in the Borrower's Rights and Responsibilities Statement."[65] Indeed, the Department's website explicitly warns that those who default may suffer damage to their credit rating and it "may take years to reestablish a good credit rating."[66] Finally, if Plaintiff Latta defaults on the loan, she will "lose eligibility any additional federal student aid" for further education.[67]

Plaintiff Latta has applied for and is eligible for the $10,000 in forgiveness and would accept it if it is determined to be legal.[68] However, she does not wish to participate in an illegal government program that would subject her to increased liability.[69] Others may not even have that choice because the Department announced that it will automatically forgive over eight million loans without the affirmative consent of the borrowers.

The Code of Federal Regulations ("CFR") has specific provisions for what a borrower, such as Plaintiff Latta, may assert as defenses for non-payment of a Student Loan. Specifically, 34 C.F.R. § 685.206(c) and (e), and 34 C.F.R. § 685.222 govern defenses to repayment (the "CFR Defenses"). "Those defense[s] to repayment standards have changed multiple times in recent years" via the requisite Administrative Procedures Act process.[70] The Loan Forgiveness Program is not included in the CFR Defenses and there are no pending proposed rules under the Administrative Procedures Act which would modify those CFR sections.

Any loan forgiveness supposedly granted under the Loan Forgiveness Program will not be enforceable as against the government in the future because it is not sanctioned under the MPN or

---

[65] Compl. Ex. A at 4.
[66] *Student Loan Delinquency and Default*, *supra*.
[67] *Id.*
[68] Compl. at ¶ 71.
[69] Compl. at ¶ 72.
[70] U.S. Dep't of Educ., Issue Paper #6: Borrower Defenses to Repayment (2021), http://tinyurl.com/32jwn43y.

the CFR Defenses.

Indeed, the "[p]ower to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution."[71] Government payments erroneously or illegally made are "in direct violation of . . . the Constitution."[72] Any loan forgiveness under the Loan Forgiveness Program will be illegal, and therefore, any forgiveness or direct payments to borrowers violates the Constitution.

An individual who receives any such payment or overpayment from the government, regardless of whether it arose under a contract, is "liable to refund it" to the United States.[73] Indeed, the United States is barred from exercising its right to recover overpayments *only* when Congress has "clearly manifested its intention to raise a statutory barrier."[74]

Beyond being allowed to collect such funds, the government is required to collect them. "The head of an executive, judicial, or legislative agency—(1) shall try to collect a claim of the United States Government for money or property arising out of the activities of, or referred to, the agency . . . ."[75] "A claim includes, without limitation—(A) funds owed on account of loans made, insured, or guaranteed by the Government . . . ."[76] Courts have even recognized the obligation to collect as a constitutional mandate. "(W)hen a payment is erroneously or illegally made it is in direct violation of article IV, section 3, clause 2, of the Constitution. Under these circumstances it

---

[71] *Royal Indem. Co.* v. *United States*, 313 U.S. 289, 294-95 (1941); *see* U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of . . . Property belonging to the United States.").

[72] *Barrett Refining Corp.* v. *United States*, 242 F.3d 1055, 1063 (Fed. Cir. 2001) (quoting *Fansteel Metallurgical Corp* v. *United States*, 172 F.Supp. 268, 270 (Ct. Cl. 1959)).

[73] *Heidt* v. *United States*, 56 F.2d 559, 560 (5th Cir. 1932) (citing *Wisconsin R. Co.* v. *United States*, 164 U.S. 190 (1896)).

[74] *Agility Pub. Warehousing Co. K.S.C.P.* v. *United States*, 969 F.3d 1355, 1366 (Fed. Cir. 2020) (quoting *United States* v. *Wurts*, 303 U.S. 414, 416 (1938)).

[75] 31 U.S.C. § 3711(a).

[76] 31 U.S.C. § 3701(b).

is not only lawful but the duty of the Government to sue for a refund thereof * * *."[77]  And Ms.

Latta, as all borrowers, "is chargeable with knowledge of [her] obligation and the breach of it . . .

."[78]

Even absent an obligation to collect, the Department can, and has, reversed course with

respect to collecting on student loans. The Department has in the past made policy reversals and

double reversals.[79]  Secretary DeVos disliked the loan forgiveness program from the prior

administration.[80] The loan forgiveness applications which had languished under Obama were

denied under Trump, but then reversed under Biden.[81]

To justify the use of the HEROES Act, the Biden administration reversed the position of

the Department by revoking a previous memo from the Department of Education's Office of Legal

Counsel, which stated that the HEROES Act could not be used to justify broad debt forgiveness.[82]

Another illustration of such enforcement reversal is the Department's recent decision to send back

to student borrowers certain amounts they had already repaid on their loans during the pandemic

loan repayment freeze.[83]

Further, neither Plaintiff Latta nor other borrowers can rely upon the possible assertion of

estoppel against the Department to avoid future repayment (and penalties, fines, increased interest,

and collection costs) because equitable estoppel generally cannot be asserted against the

---

[77] *Aetna Cas. & Sur. Co.* v. *United States*, 526 F.2d 1127, 1130 (Ct. Cl. 11975) (citing *Fansteel Metallurgical Corp.*, 172 F.Supp. at 270); *see also Int'l Harvester Co* v. *United States*, 342 F.2d 432, 442 (Ct. Cl. 1965) (it is the "duty of the Government to recover [erroneously made] payments").

[78] *Royal Indem. Co.*, 313 U.S. at 296.

[79] *See, e.g.*, Stacy Cowley, *A DeVos System Allowed 12 Minutes to Decide Student Loan Forgiveness*, The New York Times (Mar. 19, 2021), http://tinyurl.com/yadjf9v8.

[80] *Id.*

[81] *Id.*

[82] *See* Rubinstein Memo, *supra*.

[83] *See One-time Federal Student Loan Debt Relief*, *supra*.

13

government.[84] "[T]he United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit."[85] This would include the Secretary, and even the President. "Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law," and "those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law."[86]

It is further clear that participants in the Loan Forgiveness Program have notice that the program is of doubtful validity and so, even if the government could be estopped, the participants cannot later satisfy the basic element of reasonable reliance.[87] This doubtful validity became clearer when two courts recently either expressed doubts about its validity or explicitly said so.[88]

For the foregoing reasons, Plaintiff Latta believes that the program is illegal and will subject her to increased liability and will harm her credit rating if she participates.[89]

Plaintiff Latta's harm is currently accruing because she is faced with the Hobson's choice of (1) seeking and accepting $10,000 in loan forgiveness knowing that she may be facing an acceleration of debt, incurring increased interest, incurring collection fees, and negative credit ratings impact or (2) forgoing the $10,000 debt forgiveness to which she would be entitled if the

---

[84] *Heckler* v. *Cmty. Health Servs. Of Crawford Cnty., Inc.*, 467 U.S. 51, 60 (1984).

[85] *Utah Power & Light Co.* v. *United States*, 243 U.S. 389, 409 (1917); *see also Royal Indem. Co.*, 313 U.S. at 294-95.

[86] *Heckler*, 467 U.S. at 63.

[87] *See United States* v. *Boccanfuso*, 882 F.2d 666, 669-70 (2d Cir. 1989).

[88] *Brown* v. *U.S. Dep't of Educ.*, No. 4:22-cv-00908-P, 2022 WL 16858525 (N.D. Tex) (declaring unlawful and vacating LFP), *stay pending appeal denied*, No. 22-11115 (5th Cir.), *cert. granted*, No 22-535 (Dec. 12, 2022); *Nebraska* v. *Biden*, No. 22-3179, 2022 WL 16912145, at *1-2 (8th Cir.) (granting an injunction against the operation of the LFP because of "the irreversible impact the Secretary's debt forgiveness action would have as compared to the lack of harm an injunction would presently impose"), *cert. granted*, No. 22-506 (Dec. 1, 2022).

[89] Compl. at ¶ 91.

14

Loan Forgiveness Program is found to be legal and enforceable.[90]

If she accepts choice one, she will be in the purgatory of not knowing if she will be legally liable for her supposedly forgiven student loans, plus additional liabilities. She will also be violating the MPN wherein she promised to pay back her student loans, which she believes to be morally improper unless they have been legally forgiven.[91] If she accepts choice one and contests any future effort to collect her supposedly forgiven student loans and a court determines that her student loans were not forgiven, she cannot be put back into the status as it exists today because of the additional liabilities.

If she accepts choice two, then she loses the opportunity to receive a possibly legal benefit of $10,000. This is a recognizable harm.[92] In order to pursue choice two, she must opt out of the Loan Forgiveness Program as soon as she is permitted to do so on the Department's website.

Plaintiff Latta, therefore, needs a judicial declaration at this time of her rights and liabilities with respect to this conflict. In other words, she "need[s] to know the terms of the 'deal'" into which she wishes to enter, and "need[s] to know them at the time [she] file[s] suit, not later "[93]

### III. ARGUMENT

**A. Legal standard for injunctive relief.** Courts apply the same standards to a motion for a TRO as to a motion for a preliminary injunction.[94] Injunctive relief is appropriate where: (1)

---

[90] *See, e.g.*, *Blue Shield of Virginia* v. *McCready*, 457 U.S. 465, 483 (1982) (Court recognized the "offer of a Hobson's choice to [health plan] subscribers" "to choose between visiting a psychologist and forfeiting reimbursement or receiving reimbursement by forgoing treatment by the practitioner of their choice").

[91] Compl. at ¶ 13.

[92] *See Bowsher* v. *Synar*, 478 U.S. 714, 721 (1986).

[93] *See, e.g.*, *Ohio* v. *Yellen*, 539 F.Supp.3d 802, 814 (S.D. Ohio) , *abrogated by* 547 F.Supp.3d. 713, 724-25 (S.D. Ohio 2021) (finding initial injury "now gone"), *vacated as moot*, No. 21-3787, 2022 WL 17076102 (6th Cir. Nov. 18, 2022).

[94] *Ohio Republican Party* v. *Brunner*, 543 F.3d 357, 361 (6th Cir. 2008).

the movant has a strong likelihood of success on the merits, (2) the movant will suffer irreparable injury if the injunction is denied, (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction is in the public interest.[95] When the party opposing a TRO or injunction is the federal government, the balance-of-harms factor "merge[s]" with the public-interest factor.[96]  These factors all decidedly favor granting a TRO and preliminary injunction.

In addition, under the Administrative Procedure Act, "to the extent necessary to prevent irreparable injury," the court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."[97] The factors governing issuance of a preliminary injunction also govern issuance of relief under Section 705 of the APA.[98]  Plaintiff meets those requirements here.

**B.  Plaintiff is likely to succeed on the merits.**

**1.  The Loan Forgiveness Program violates the Administrative Procedures Act.**

The Administrative Procedures Act provides for a private cause of action for someone who is "adversely affected or aggrieved by agency action . . . ."[99] A court shall

> hold unlawful and set aside agency action, findings, and conclusions found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law . . . .[100]

The Secretary's actions violate several of these provisions.

**a.  The Department violated the APA by adopting the Loan Forgiveness Program without following the proper rulemaking procedures.**

---

[95] *City of Pontiac Retired Employees Ass'n* v. *Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).
[96] *Nken* v. *Holder*, 556 U.S. 418, 435 (2009).
[97] 5 U.S.C. § 705.
[98] *Ohio* v. *Nuclear Regul. Com'n*, 812 F.2d 288, 290 (6th Cir. 1987).
[99] 5 U.S.C. § 702.
[100] 5 U.S.C. § 706(2).

The APA requires agencies to subject their substantive rules to notice and comment.[101] A "rule" is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy."[102] Legislative rules typically "grant rights, impose obligations, or produce other significant effects on private interests."[103] The APA requires courts to "hold unlawful and set aside agency action[s]" that are adopted "without observance of procedure required by law."[104]

The Debt Forgiveness Program is a legislative rule. It creates a new program designed to implement a policy of eliminating or reducing debt obligations for certain individuals. It "grant[s] rights" by promising to eliminate individuals' debt if they meet certain requirements, and it "impose[s] obligations" on the Department to forgive debt for those who meet the requirements.[105] The Program also produces "significant effects on private interests."[106] Indeed, the Program "touches the lives of [tens of millions of] Americans" with student loan debt.[107]

The Program also effectively amends or repeals the Department's existing regulations. "[I]f an agency adopts 'a new position inconsistent with' an existing regulation, or effects 'a substantive change in the regulation,' notice and comment are required."[108] Under the Department's regulations, the agency can compromise student loan debt only (1) where "the debtor is unable to

---

[101] *See* 5 U.S.C. § 553.

[102] 5 U.S.C. § 551(4).

[103] *State of Ohio Dep't of Hum. Servs.,* v. *U.S. Dep't of Health & Hum. Servs., Health Care Finance Admin.,* 862 F.2d 1228, 1233 (6th Cir. 1988) (citation omitted).

[104] 5 U.S.C. § 706(2); *e.g.*, *Texas* v. *United States*, 809 F.3d at 146 (affirming preliminary injunction of DHS's DAPA program for failing to go through the notice and comment period).

[105] *State of Ohio Dep't of Hum. Servs.,* 862 F.2d at 1233; *see also Nat'l Min. Ass'n* v. *McCarthy*, 758, F.3d 243, 251-52 (D.C. Cir. 2014) ("An agency action that sets forth legally binding requirements for a private party to obtain a permit or license is a legislative rule.").

[106] *State of Ohio Dep't of Hum. Servs.,* 862 F.2d at 1233.

[107] *Azar* v. *Allina Health Servs.,* 139 S. Ct. 1804, 1808 (2019).

[108] *U.S. Telecom Ass'n* v. *FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005) (quoting *Shalala* v. *Guernsey Mem'l Hospital*, 514 U.S. 87, 100 (1995).

pay the full amount in a reasonable time, as verified through credit reports or other financial information"; (2) the Department is "unable to collect the debt in full within a reasonable time by enforced collection proceedings"; (3) "the cost of collecting the debt does not justify the enforced collection of the full amount"; or (4) "[t]here is significant doubt concerning the Government's ability to prove its case in court."[109] None of those circumstances apply here. Because the Debt Forgiveness Program is irreconcilable with the Department's own regulations, the Department could not adopt the Program without conducting notice-and-comment rulemaking.[110]

In addition, for any "regulations pertaining to [Title IV of the Higher Education Act of 1965]," the Department is also required to use "negotiated rulemaking" to develop the rule.[111] In negotiated rulemaking, before proposing its rule, the Department

> obtain[s] the advice of and recommendations from individuals and representatives of the groups involved in student financial assistance programs under [Title IV], such as students, legal assistance organizations that represent students, institutions of higher education, State student grant agencies, guaranty agencies, lenders, secondary markets, loan servicers, guaranty agency servicers, and collection agencies.[112]

The Department's proposed regulations must then "conform to agreements resulting from such negotiated rulemaking unless the Secretary reopens the negotiated rulemaking process or provides a written explanation to the participants in that process why the Secretary has decided to depart from such agreements."[113] Thus, to the extent the Debt Forgiveness Program pertains to Title IV, the Department was also required to adopt its proposed rule through negotiated

---

[109] 31 C.F.R. § 902.2(a); *see also* 34 C.F.R. § 3070(a)(1), (e)(1).

[110] *See, e.g.*, *Nat'l Family Planning & Reprod. Health Ass'n* v. *Sullivan*, 979 F.2d 227, 240 (D.C. Cir. 1992).

[111] 20 U.S.C. § 1098a(b)(2); *see The Negotiated Rulemaking Process for Title IV Regulations–Frequently Asked Questions*, U.S. Dep't of Educ., http://bit.ly/3SCFqFf (last visited Dec. 17, 2022) ("The Department is specifically required by law to use negotiated rulemaking to develop [notices of proposed rulemaking] for programs authorized under Title IV of the Higher Education Act of 1965.").

[112] 20 U.S.C. § 1098a(a)(1).

[113] 20 U.S.C. § 1098a(b)(2).

rulemaking.[114]

The Department appears to believe that it has authority under the HEROES Act to promulgate the Loan Forgiveness Program and so the agency can "disregard notice-and-comment requirements."[115]  That belief is wrong. The HEROES Act does not authorize the Debt Forgiveness Program and thus does not excuse the Department from complying with the APA's requirements.

### b.   The Secretary's invocation of the HEROES Act without an express directive from the President according to the National Emergencies Act violates the APA because it exceeds the Secretary's statutory authority and is not in accordance with the law.

The Secretary claims the ability to forgive the student debt based on the HEROES Act.[116]

The Secretary relies on the following language in the HEROES Act:

> Notwithstanding any other provision of law, . . . the Secretary of Education [] may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act [20 U.S.C. 1070 et seq.] as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2).[117]

This then also requires a proper Presidential invocation of the National Emergencies Act, which provides:

> When the President declares a national emergency, no powers or authorities made available by statute for use in the event of an emergency shall be exercised unless and until the President specifies the provisions of law under which he proposes that he, or other officers will act. Such specification may be made either in the declaration of a national emergency, or by one or more contemporaneous or subsequent Executive orders published in the Federal Register and transmitted to the Congress.[118]

The Department has not satisfied the requirements of either law.

---

[114] *Id.*; *see* Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans, 2022 WL 3975075, at *2 (Op. O.L.C. Aug. 23, 2022) ("The statutory provisions governing each student loan program are set forth in title IV of the Higher Education Act of 1965.").

[115] *Id.* at *3 (citing 20 U.S.C. § 1098bb(b)(1)-(2)).

[116] Federal Student Aid Programs, 87 Fed. Reg. at 61514.

[117] 20 U.S.C. § 1098bb(a)(1).

[118] 50 U.S.C. § 1631.

First, the HEROES Act only allows for waiver and modification in connection with war or other military operations or national emergencies.[119] While Defendants point to the COVID-19 pandemic, that is not a "national emergency" under the HEROES Act. The term "national emergency" must be interpreted in connection with surrounding text as well as the history and context of the HEROES Act, which compel the conclusion that only a military-related national emergency can trigger the Act's "waive or modify" authority.

When interpreting a statute, the Supreme Court has instructed lower courts to apply "the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress.'"[120] "[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar to those enumerated by the specific words."[121] As such, the phrase "national emergency" in § 1098bb(a)(1) must be interpreted in the context of preceding words, namely "war" and "other military operation." The national emergency must be similar in nature to war and military operations—it must relate to the armed forces. The Act's legislative history and purpose support this view. Congress enacted the HEROES Act after the September 11 terrorist attacks specifically "to support the members of the United States military and provide [student loan] assistance with their transition into and out of active duty and active service."[122]

Second, the Secretary has no authority to act under the National Emergencies Act without a specific directive from the President invoking the provisions of the HEROES Act. The National Emergencies Act is clear: "no powers or authorities made available by statute for use in the event

---

[119] 20 U.S.C. § 1098bb.

[120] *Yates* v. *United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson* v. *Alloyd Co.*, 513 U.S. 561, 575 (1995)).

[121] *Washington State Dep't of Soc. & Health Servs.* v. *Guardianship Est. of Keffeler*, 537 U.S. 371, 284 (2003).

[122] 20 U.S.C. § 1098aa(b)(6).

of an emergency shall be exercised unless and until the President specifies *the provisions of law* [e.g., the HEROES Act] under which he proposes that he, or other officers will act."[123] The President may do so "either in the declaration of a national emergency, or by one or more contemporaneous or subsequent Executive orders published in the Federal Register . . . ."[124] Neither President Trump nor President Biden ever did that.[125]  Neither President Biden's extensions of the national COVID emergency nor any subsequent declaration followed the procedures set forth in the National Emergencies Act for invoking the Secretary's national emergency powers.[126]

Because there is no qualifying Presidential pronouncement "specif[ying] *the provisions of law* under which [the President] proposes that he, or [the Secretary] will act,"[127] the National Emergencies Act has not been properly followed to grant the Secretary any power under the HEROES Act.

Consequently, the Secretary has no legal authority to rely on the national emergency to forgive student loans and the Secretary's actions violate 5 U.S.C. § 706(2)(B) and (C).

### c.   The Secretary's action violates the APA because it is unlawful under Article I, § 9 and Article 4, § 3, cl. 2 of the Constitution.

Defendants' interpretation of the HEROES Act to authorize the outright forgiveness of debt impermissibly usurp Congress's powers. First, while Congress authorized the Secretary to issue loans as part of its appropriation powers, that appropriation did not authorize the forgiveness

---

[123] 50 U.S.C. § 1631 (emphasis added).

[124] 50 U.S.C. § 1631.

[125] *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 18, 2020) (specifically invoking the Secretary of HHS's national emergency powers, but not giving the Secretary of Education any powers to forgive student debt).

[126] *E.g.*, Continuation of the National Emergency Concerning the Coronavirus Disease 2019 (COVID-19) Pandemic, 87 Fed. Reg. 10289 (Feb. 18, 2022).

[127] 50 U.S.C. § 1631 (emphasis added).

of those loans. Second, only Congress can dispose of government property and it has not delegated the authority to the Secretary to discharge nearly $500,000,000,000 in accounts receivable.

Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations by Law." This Clause reflects the Framers' decision to "carefully separate[] the 'purse' from the 'sword' by assigning to Congress and Congress alone the power of the purse."[128] Moreover, this Clause "assure[s] that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants."[129] Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."[130]

The Omnibus Budget Reconciliation Act of 1993 authorized an open-ended funding of the William D. Ford Federal Direct Loan Program for two specific purposes only.[131] As amended, 20 U.S.C. § 1087a(a) provides that:

> There are hereby made available, in accordance with the provisions of this part, such sums as may be necessary (1) to make loans to all eligible students (and the eligible parents of such students) in attendance at participating institutions of higher education selected by the Secretary, to enable such students to pursue their courses of study at such institutions during the period beginning July 1, 1994; and (2) for purchasing loans under section 1087i–1 of this title.

Congress did not authorize or appropriate funds for the purpose of the forgiveness or cancellation of direct loans. Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."[132] "A law may be construed to

---

[128] *Texas Educ. Agency* v. *U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (quoting The Federalist No. 78 (Alexander Hamilton); *see also* The Federalist No. 48 (James Madison) ("[T]he legislative department alone has access to the pockets of the people.").

[129] *Office of Pers. Mgmt.* v. *Richmond*, 496 U.S. 414, 428 (1990).

[130] *Id.* at 424 (quoting *Cincinnati Soap Co.* v. *United States*, 301 U.S. 308, 321 (1937)).

[131] Omnibus budget Reconciliation Act of 1993, § 4, 20 U.S.C. § 1087a (1993).

[132] 31 U.S.C. § 1301(a).

make an appropriation out of the Treasury . . . *only* if the law specifically states that an appropriation is made . . . ."[133] Thus, a separate cancellation or forgiveness of existing loans involving federal funds requires a separate act of Congress.

Further, starting in 1992, the President's budget "shall reflect the costs of direct loan . . . programs."[134] The President's budget for FY 2022 and 2023 are extensive and complicated documents, but Plaintiff has not found therein any funding for the Loan Forgiveness Program. At the same time, the Department has recognized that the funds to be repaid belong to the Treasury.

> Federal law related to the collection of debts owed to the government requires ED to request that the U.S. Department of the Treasury withhold money from your federal or state income tax refunds, Social Security payments (including Social Security disability benefits), and other federal payments to be applied toward repayment of your defaulted federal student loan. This withholding is called Treasury offset.[135]

The Fifth Circuit has even determined that the Constitution precludes Congress from divesting its power of the purse to an executive agency.[136] Nevertheless, the Department claims that the HEROES Act authorizes the Secretary to wield the congressional power of the purse by unilaterally forgiving billions in student debt. This allows the Department to "reduce amounts that would otherwise flow to the general fund of the Treasury."[137]

The Department's argument that it can both lend as much as it wants and then cancel as much debt as it wants is not consistent with either the power of the purse or the Omnibus Budget

---

[133] 31 U.S.C. § 1301(d) (emphasis added).

[134] 2 U.S.C. § 661c(a).

[135] U.S. Dep't of Educ., *Collections on Defaulted Loans*, Federal Student Aid, http://studentaid.gov/manage-loans/default/collections.

[136] *Community Financial Services Ass'n of Am.* v. *CFPB,* 51 F.4th 616, 638-42 (5th Cir.), *cert. granted*, No. 22-448 (Nov. 14, 2022).

[137] *Id.* at 638; *see U.S. Department of Education Estimate: Biden-Harris Student Debt Relief to Cost an Average of $30 Billion Annually Over Next Decade*, U.S. Dep't of Educ. (Sep. 29, 2022), https://tinyurl.com/2r2rwxjd (the Department recognizing that "in terms of reduced cash flows into the government" the LFP will cost "roughly $305 billion").

Reconciliation Act of 1993. The Department's actions are "*the epitome* of the unification of the purse and the sword in the executive—an abomination the Framers warned 'would destroy that division of powers on which political liberty is founded.'"[138]

Separately, Article IV, § 3, cl. 2 of the Constitution (sometimes labeled the "Property Clause") provides: "The Congress shall have Power to dispose of . . . Property belonging to the United States." A loan is an accounts receivable asset, which—of course—is property. It is indisputable that the subject student loans constitute "Property belonging to the United States." And only Congress has the "[p]ower to release or otherwise dispose of the rights and property of the United States," and "[s]ubordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted."[139]

Congress has not conferred the power to dispose of the student loans upon the Secretary or the Department. The Secretary is a "subordinate officer[] charged with the ministerial duty of collecting the [loans]."[140] So even if the discharge of debt would not require a separate Congressional appropriation, it would be barred by the Property Clause. The Secretary cannot point to any provision that allows the disposal of half of a trillion dollars of government property.

In addition, as part of the Loan Forgiveness Program, the Secretary intends to do more than merely forgive debt. He is going to issue checks to borrowers for monies they paid on their promissory notes during the pandemic.[141] This is a disbursement of funds from the U.S. Treasury without any Congressional appropriation or other authorization. Even if the other aspects of the Loan Forgiveness Program were somehow authorized, the administration has not provided any

---

[138] *Id.* at 640 (quoting 2 *The Works of Alexander Hamilton* 61 (Henry Cabot Lodge ed., 1904)).

[139] *Royal Indem. Co.*, 313 U.S. at 294.

[140] *Id.*

[141] *One-time Federal Student Loan Debt Relief, supra.*

legal authority for such an un-appropriated disbursement.

These loan forgiveness actions and the outright payments, whether "erroneously or illegally made," are "in direct violation of article IV, section 3, clause 2, of the Constitution."[142]

Because there is no act of Congress which either "specifically states that an appropriation is made"[143] or "confer[s] upon"[144] the Secretary the right to cancel one half-trillion dollars' worth of student-loan accounts receivable or to pay funds directly to the borrowers, the Loan Forgiveness Program violates 5 U.S.C. § 706(2)(B) and (C) and is unconstitutional.

### d.  The Department of Education's action is invalid under the APA because it is arbitrary, capricious, and an abuse of discretion.

For an agency action to not be considered arbitrary, capricious, or an abuse of discretion, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[145]  This standard requires that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."[146]  Additionally, "the APA requires an agency to provide more substantial justification when 'its new policy rests upon factual findings that contradict those which underlay its prior policy . . . .'"[147]  Specifically, the agency must explain why it is "disregarding facts and circumstances that underlay or were engendered by the prior policy."[148]  The Loan Forgiveness Program fails on both counts.

---

[142] *Aetna Cas. & Sur. Co.*, 526 F.2d at 1130.
[143] 31 U.S.C. § 1301(d).
[144] *Royal Indem. Co.*, 313 U.S. at 294.
[145] *Motor Vehicle Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).
[146] *FCC* v. *Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).
[147] *Perez* v. *Mortg. Bankers Ass'n*, 575 U.S. 92, 106 (2015) (quoting *FCC* v. *Fox Television Stations Inc.*, 556 U.S. 502, 515 (2009)).
[148] *Fox*, 556 U.S. at 516.

First, the program is arbitrary and capricious because Defendants failed to provide (at least in its official notice) reasoned explanations for their decisions in a manner that "may reasonably be discerned."[149]  Neither the October 12 notice nor the legal memorandum it references explains how Defendants reached *any* of the Loan Forgiveness Program's key decisions.[150] There is no explanation in the published notice why the amount of cancellation was set at $10,000 for non-Pell awardees and $20,000 for Pell awardees.  Nor did Defendants explain how they set the income eligibility thresholds at $125,000 for individuals and $250,000 for households.  Importantly, Defendants failed to connect these figures to the congressional mandate for HEROES Act relief that eligible borrowers "are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals."[151]  Indeed, nothing in the administrative record suggests Defendants considered a requirement that individual applicants for debt forgiveness be required to allege, let alone provide evidence that they are in a worse financial position in relation to outstanding federal student loan debt as a result of the COVID-19 pandemic.  Further, the Department intends to issue checks repaying borrowers for payments made during the past two years, but not to those who had made such payments prior to that.

The Department's published explanation for the amounts of debt forgiveness and income limits is essentially that its lawyers asserted that the Department has legal authority under the HEROES Act to do whatever it wants. That is inadequate.[152]  There is simply no published indication that the Department "has reasonably considered the relevant issues and reasonably

---

[149] *Encino Motorcars LLC* v. *Navarro*, 579 U.S. 211, 221 (2016).

[150] *See* Notice of Debt Cancellation Legal Memorandum, 87 Fed. Reg. 52943 (Aug. 30, 2022).

[151] 20 U.S.C. § 1098bb(a)(1).

[152] *See Dep't of Homeland Sec.* v. *Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (rejecting DHS's reliance on an Attorney General memorandum finding it illegal for DHS to extend work authorization and other benefits to DACA recipients as a satisfactory explanation for recission of a policy extending forbearance to childhood arrivals).

explained the decision."[153] Instead, the opposite is true. It is apparent that President Biden pre-determined that he would require the Department to forgive the subject loans before the Department did any fact finding or analysis and, upon information and belief, the Department simply engaged in post facto justifications to satisfy the President's directives. The President and the Secretary were "determined to [forgive the debt] from the time [they] entered office."[154] Indeed, even during then-candidate Biden's 2020 campaign, he was determined to do this—with or without congressional approval. Ultimately, the Secretary conformed the Department's legal and factual analysis to the President's campaign and pre-midterm election promises. That is not reasoned rule making and this Court must set aside such action.[155]

Second, Defendants failed to explain the Department's 180-degree reversal—in less than two years—of its position on its authority to implement a mass loan forgiveness program. When the Department issued its current (and incorrect) *legal* interpretation of its debt-cancellation authority under the HEROES Act, it did not address the underlying *factual* predicates justifying its change in course.[156] Indeed, an agency must provide a more detailed explanation when "its new policy rests upon factual findings that contradict those which underlay its prior policy.[157] Especially in light of President Biden's declaration that "the pandemic is over,"[158] the Department's new Loan Forgiveness Program is a policy reversal requiring a full and complete explanation.

**e.   The Department of Education's action is invalid under the APA because it violates the Major Questions Doctrine.**

Article I of the U.S. Constitution vests *all* legislative power in Congress. Waiving or

---

[153] *Prometheus Radio Project*, 141 S. Ct. at 1158.
[154] *Dep't of Commerce* v. *New York*, 139 S. Ct. 2551, 2574 (2019).
[155] *See* 5 U.S.C. § 706(2).
[156] Federal Student Loan Programs, 87 Fed. Reg. at 52943-945. (").
[157] *see Fox*, 556 U.S. at 515
[158] Rebecca Falconer, *Biden: "The Pandemic is over"*, Axios (Sep. 18, 2022), http://tinyurl.com/AxiosPandemic.

modifying provisions of an act of Congress is a legislative function that is vested solely in Congress and may not be exercised by an executive agency.[159] The Major Questions Doctrine applies when an agency claims the power to resolve a matter of great "political significance" or if it "seeks to regulate a significant portion of the American economy . . . ."[160] The Department's Loan Forgiveness Program falls into both categories.

Outright debt forgiveness—on a categorical basis for 40 million borrowers and costing over one-half-trillion dollars—is a power of "vast economic and political significance."[161] Canceling student loans is indisputably one of today's most hotly debated issues. Underscoring the political significance of the Loan Forgiveness Program is the fact that Congress has "conspicuously and repeatedly declined to enact" it through statute.[162] Multiple congressional proposals for sweeping student-loan debt cancellation have failed.[163] The CARES Act suspended loan payments to all federal student loan borrowers.[164] But proposed legislation to forgive principal, interest, and fees due on federal student loans has failed.[165]

The Loan Forgiveness Program also has vast "economic . . . significance,"[166] costing between $430 billion and $519 billion.[167] The Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'"[168]

---

[159] *Util. Air Regul. Grp.* v. EPA, 573 U.S. 302, 328 (2014) ("[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate.").

[160] *West Virginia* v. *EPA*, 142 S. Ct. 2587, 2620 (2022) (Gorsuch, J., concurring) (quotation marks omitted).

[161] *Id.* at 2605.

[162] *West Virginia*, 142 S. Ct. at 2610.

[163] *E.g.*, Student Loan Debt Relief Act of 2019, S. 2235, 116th Cong. (2019); Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021).

[164] Federal Student Aid Programs, 87 Fed. Reg. at 61413-514.

[165] *See, e.g.*, Income-Driven Student Loan Forgiveness Act, H.R. 2034, 117th Cong. (2021).

[166] *West Virginia*, 142 S. Ct. at 2608.

[167] *See* Swagel, *supra*.

[168] *Alabama Ass'n of Realtors* v. *HHS*, 141 S. Ct. 2485, 2489 (2021) (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

28

In *Alabama Association of Realtors*, the economic impact of the program the Court struck down would likely have been about $50 billion—just one tenth of the amount at issue here, and it affected 6-17 million people—compared to over 40 million here.[169] Indeed, the Department's loan forgiveness scheme is estimated to be ten to fifteen times the total of all prior student debt forgiven.[170] "'Congress could not have intended to delegate' such a sweeping and consequential authority 'in so cryptic a fashion.'"[171] The Defendant's broad reading of the HEROES Act would allow the Secretary "'unheralded' regulatory power over 'a significant portion of the American economy.'"[172]

Finally, Defendants are "'claim[ing] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [their] regulatory authority.'"[173]  In the past, the Department has "generally invoked the HEROES Act narrowly to grant relief to limited subsets of borrowers, such as deployed military service members . . . ."[174]  Indeed, the Department's Acting General Counsel concluded in 2021 that "the Department has never relied on the HEROES Act . . . for the blanket or mass cancellation . . . of student loan principal balances" or for the "material change of repayment amounts or terms."[175]

Therefore, the Loan Forgiveness Program must be vacated.

## 2.  Plaintiff is entitled to a declaratory judgment on her contractual obligations.

Under the Declaratory Judgment Act, a federal court "may declare the rights and other

---

[169] *Id.*

[170] *See* Swagel, *supra*.

[171] *West Virginia*, 142 S. Ct. at 2608 (quoting *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

[172] *Id.* (quoting *Util. Air Regul. Grp.*, 573 U.S. at 342).

[173] *Id.* at 2610 (quoting *Util. Air Regul. Grp.*, 573 U.S. at 324).

[174] Kevin M. Lewis & Edward C. Liu, Cong. Rsch. Serv., LSB10568 Version 3, The Biden Administration Extends the Pause on Federal Student Loan Payments: Legal Considerations for Congress 2-3 (2021).

[175] Rubinstein Memo, *supra*, at 6 (emphasis added).

legal relations of any interested party seeking such declaration . . . ."[176] The MPN is an enforceable contract with the federal government in which Plaintiff has promised to pay to the Department all funds she has borrowed. While the Department's announced Loan Forgiveness Program purports to modify the terms and conditions of the MPN, as discussed above, neither the MPN nor the law allows such a modification. But Plaintiff "is charge[d] with knowledge of [her] obligation and the breach of it . . . ."[177] Being so charged by the Supreme Court, she is entitled to know the extent of her obligations under the MPN in light of the Department's announced Loan Forgiveness Program. At this moment, only this Court can provide that knowledge. Further, she is entitled to know her obligations now. The validity of the Department's decision is ripe for judicial review because of the hardship to Ms. Latta if this Court withholds its consideration.[178]

In making such determinations, the courts consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."[179]

To require Plaintiff to proceed with an application for forgiveness "without knowing whether the [] scheme is valid would impose a palpable and considerable hardship."[180] At a minimum, borrowers who apply and receive forgiveness suffer "the continuing uncertainty and expense of depending for compensation on a process whose authority is undermined because its constitutionality is in question."[181]

---

[176] 28 U.S.C. § 2201.

[177] *Royal Indem. Co.*, 313 U.S. at 296.

[178] *See Ohio Forestry Ass'n, Inc.* v. *Sierra Club*, 523 U.S. 726 (1998).

[179] *Id.* at 733.

[180] *Thomas* v. *Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 581 (1985) (quoting *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 201-202 (1983)).

[181] *Id.*

### C.  Plaintiff will suffer irreparable injury if the injunction is denied.

A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages.[182]  "Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."[183]  Plaintiff has shown that the Loan Forgiveness Program violates two constitutional provisions. Beyond that, Plaintiff does not seek monetary damages in this case nor can she or will she be able to in the future.  But she does face the very real prospect of economic harm based on the government's actions. Her injury is not knowing what the Supreme Court has charged her to know: "knowledge of [her] obligation and the breach of it . . . ."[184]  She is now faced with the Hobson's choice of a loan forgiveness now, which will trigger increased liability if a court ruling or a Department official recognizes that it is illegal—putting her into a loan liability purgatory—or forgoing a benefit for which she is legally entitled to take if it is in fact legal. If legal, this is a government entitlement.

The Defendants have claimed that the Loan Forgiveness Program is statutorily authorized and that eligible borrowers are entitled to the relief, even if they do not apply for it.[185] So, Plaintiff must take the benefits now subject to a cloud of uncertainty or lose her entitlement.

### D.  The balance of harms and the public interest factor weighs in Plaintiff's favor.

When the party opposing a TRO or an injunction is the federal government, the balance-of-harms factor merges with the public-interest factor.[186]  Plaintiff will suffer irreparable harms

---

[182] *Basicomputer Corp.* v. *Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

[183] *Overstreet* v. *Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

[184] *Royal Indem. Co.*, 313 U.S. at 296.

[185] *Goldberg* v. *Kelly*, 397 U.S. 254, 262 (1970) (recognizing that welfare "benefits are a matter of statutory entitlement for persons qualified to receive them.").

[186] *Nken*, 556 U.S. at 435.

absent immediate injunctive relief. By contrast, an order preventing Defendants from enforcing its unlawful Loan Forgiveness Program will inflict no cognizable injury on the agency because officials "do [] not have an interest in the enforcement of [illegal government action]."[187]  Nor will borrowers be harmed because their loan payments now have been deferred and interest is not accruing until August 30, 2023.[188] Further, other borrowers will simply be abiding by their contractual obligations. In the event they make payments which the government later determines should not have been made pursuant to the Loan Forgiveness Program (if it is found to be legal), the Treasury can refund those payments, as it has done.[189]

The public interest similarly supports a TRO and injunction because "the public's true interest lies in the correct application of the law."[190] Accordingly, "[t]here is generally no public interest in the perpetuation of unlawful agency action."[191]  "[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends."[192]  Since the Loan Forgiveness Program is unlawful, the public interest calls out for this Court to enjoin it.

In addition, the sheer magnitude of the Loan Forgiveness Program—both in terms of the tens of millions of people affected and the one-half-trillion dollars of public expenditure— weighs heavily in favor of scrupulous judicial evaluation of its validity to prevent the extensive problems of a premature imposition thereof. Such an approach is especially warranted because Defendants did not seek any public comment on the Loan Forgiveness Program before rushing to adopt it.

---

[187] *N.Y. Progress & Prot. PAC* v. *Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).
[188] *Biden-Harris Administration Continues Fight for Student Debt Relief for Millions of Borrowers, Extends Studen Loan Repayment Pause*, U.S. Dep't of Educ. (Nov. 22, 2022), https://tinyurl.com/24bctac8.
[189] *See* Office of Inspector Gen., U.S. Dep't of Educ., ED-OIG/I20NY0010, Federal Student Aid's Suspension of Involuntary Collection in Response to the Coronavirus Pandemic 5 (June 15, 2021), https://tinyurl.com/j88pp7sr.
[190] *Kentucky* v. *Biden*, 23 F.4th 585, 612 (6th Cir. 2022).
[191] *League of Women Voters of U.S.* v. *Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).
[192] *Alabama Ass'n of Realtors*, 141 S. Ct. at 2490.

## CONCLUSION

Because of the injury triggered by the Hobson's choice facing Plaintiff and other borrowers, the harm imposed by the illegal program, the benefit to the public interest of the proper collection of outstanding loans, and the lack of a government interest, the balance of interest weighs in favor of granting the injunction.

Respectfully submitted,

*/s/ David C. Tryon*

David C. Tryon (#0028954)
Jay R. Carson (#0068526)
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
d.tryon@buckeyeinstitute.org
*Counsel for Plaintiff*

33

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and Memorandum In Support was filed electronically with the Court this 3rd day of January, 2023 and mailed by means of U.S. Certified Mail to the following parties:

U.S. DEPARTMENT OF EDUCATION
400 Maryland Avenue, SW
Washington, D.C. 20202

MIGUEL CARDONA, SECRETARY OF EDUCATION,
IN HIS OFFICIAL CAPACITY
400 Maryland Avenue, SW
Washington, D.C. 20202

/s/ David C. Tryon
David C. Tryon (#0028954)

34